Department of HHS. Good morning, Your Honors. May it please the Court. My name is Allison Spruill and I'm proud to represent Coppers Cove LTC Partners. Coppers Cove LTC Partners is a company that owns and operates a nursing home in Coppers Cove, Texas, a small town in Central Texas. A nursing home is known as Coppers Cove Nursing and Rehabilitation Center. This case, Your Honor, we believe involves the quintessential or a quintessential case of government overreaching that occurred during a nursing home survey in October of 2016. We think there was an incredible abuse of power during that survey. There were mistakes that were made that were made by a law judge with the Departmental Appeals Board for the U.S. Department of Health and Human Services that led to the rendition of an improper judgment. We believe that the ALJ's decision was improperly upheld by the full Departmental Appeals Board when we asked for review of the ALJ's decision. Specifically, we believe that in this case, the government has improperly attempted to usurp the treatment decisions of a physician, a pharmacist, and a family. Yes, Your Honor? You didn't file a reply brief? I did not. All right. Well, then I'll ask a few questions. Okay. This case, I won't go into a lot of the facts because Judge Holmes, you pointed out that the court is familiar with the facts and familiar with the briefs. This involved a very unusual set of facts and circumstances involving a young man that had lived in this particular nursing home since he was seven years old. He was 35 in 2016 at the time of the survey. He had a horrific set of underlying diagnoses, just a tragic, tragic situation. This nursing home took care of this young man for over 25 years when nobody else could or would, including his family. And that's not a criticism of his family. It just was he was in a situation where the family could not care for him. So Copper's Cove is where he grew up. It was basically the only home he had ever known. My client acquired Copper's Cove in 2014. There were a number of provisions for this young man that had been in place since he was very young, specifically having to do with the way his room was configured, the way that the staff dealt with him. And his mother, who was his legal guardian, who became his legal guardian when he turned 18, had specifically consented, and this is on page 1,264 of the record, specifically consented to the use of an antipsychotic medication called Risperidol, or Risperidone, I believe is the generic. And in this case, as evidenced by the records from the treating physician, Risperidol was used as a normal medication. There was a certain level that this young man took every day, and when his behavior escalated, Ativan was added on top of the Risperidol. Much like someone who takes blood pressure medicine might have a certain baseline or threshold set of medications, but when the blood pressure rises or drops significantly, there would be a breakthrough medication. Risperidol was used. Question. So according to the FDA labeling, Risperidone is an antipsychotic. It is. It is indicated for bipolar disorder and schizophrenia and irritability. Was this patient, this resident, ever diagnosed with any of those disorders by a physician? He was. He had a diagnosis of psychosis as well as bipolar disorder. Because I thought the ALJ and the appeals board found there were no credible diagnoses in the record of any of those conditions that called for that medication. And I believe that's an area in which they were wrong, because if you look at the pharmacy consultant reports, they're going to the physician on a monthly basis with recommendations being made or not made sometimes. They're going to the physician for the physician to review. It indicates that the Risperidol was being used for bipolar in addition to ADHD. Risperidol is from time to time used for treatment of ADHD. And the issue that we have is the ALJ and then the departmental appeals board are saying you're using too much of this drug. You can't use this drug for this condition. And our position is that's not for the ALJ or the departmental appeals board reviewing the ALJ's decision to decide. I'm on the ALJ, I'm sorry, the appeals board decision says that his doctor said, treating physician said, oh, it could have killed him. That's a statement that the surveyor made in the statement of deficiencies. That's not what's in the medical record. We would point you, your honor, to pages 1264, or I'm sorry, I'm sorry, not 1264, 543, in which the doctor, yes, your honor, the record, page 543, and also the record at page 1227. Page 1227 shows where the physician actually increased the Risperidol in June of 2016, which is the time period that really started the inquiry when the surveyors came in in October and they looked back. The pivotal time period at issue is June through October. So 1227 is the June increase by the physician. If you look maybe one or two pages before that, so it would be around 1225, 1226, you will see that before June 17th, the doctor had actually seen this resident and had noted his plan to increase Risperidol, although he did not give a specific level that he indicated, because what he was trying to do was increase Risperidol at a threshold level in order to decrease the PRN Ativan, because it was the PRN, or as needed, I'm sorry, I take for granted that everybody understands the medical abbreviations. When I say PRN, that means as needed. Ativan is the drug that was being given as a break for breakthrough issues, if you will, whenever there was excessive hitting or striking other residents or pulling residents' hair. This resident had a very unusual mode of ambulation. When he was out of his wheelchair, he ambulated on all fours. He used his front arms with his wrist bent back, almost as you would see a primate who's not able to stand upright, because this young man couldn't stand. He would climb with his arms, or he would try, and that created at times a very dangerous situation for elderly female residents, because this was a young man who was 35 years old and still physically strong in some ways, while severely disadvantaged in others. It was a really tricky situation for the nursing home to attempt to manage these conditions. They had done so for 25 years until ... Yes, Your Honor. What is Ativan? It is an anti-anxiety medication. I don't know that it is quite in the same class of drug as Risperidol, which is classified as an antipsychotic. Incidentally, in 2012, there is a document that my client, once it took over operation of the nursing home, went back and had the mother of this young man sign. It's on page 1264 of the record, noting that the mother was specifically requesting and consenting to the use of Risperidol as one of this young man's routine medications. Where is she living now? I'm not sure. They moved out of the area, because when it became clear that this situation at the nursing home would be unworkable, the last information that we had was that the mom was in some type of litigation of her own with the state. My client was not a party to that, and they moved away from Coppers Cove to a larger metropolitan area where she could attempt to get him into some type of either an MHMR facility or a group home or whatever he would qualify for outside of a nursing home, something that's just strictly MHMR related. It's been so many years since this has been pending, we lost track, but he moved about... Your brief says he moved to three different group homes. Ma'am? Your brief says he got kicked out of three different groups. Because they couldn't handle him either, and that's what eventually resulted in the mom leaving the area. With the wick law here, what is your best case for saying that as a matter of law, they overruled the treaty's decisions, directives? The case from this court that I think best addresses that situation is a per curiam opinion in which Judge Dennis was actually on the panel. The Myers versus Apfel case, I believe that was decided by this court in 2001. It's not the type of case that we have here admittedly, but we don't have a lot of nursing home civil money penalty cases that come out of the appellate courts. It is a request or an appeal of denial of social security disability benefits in which there were multiple treating physicians who had made entries in records, who had done examinations for an impairment rating or something that is specific to an SSI claim. And when the case was tried before the ALJ, the ALJ did not consider or this court rule did not give proper consideration to the testimony or the documentary evidence from the treating physicians. The cases I've looked at, that's the closest one because it actually reversed the ALJ's decision. There was a similar decision out of this court in 2000 that is the Newton versus Apfel case where some of the same principles as the Myers case were discussed. However, there were different issues that led to the ALJ decision being upheld. So in terms of where this court has reversed the best case that I can find is the Myers case. Do you do a lot of these cases? I do, Your Honor. All right. Well, I think one of their responses aside from the facts where they say that the doctor actually backtracked on the Risperdal, whether he should have given it at the level of four or five or whatever, I don't think the nursing home had some kind of independent duty to scrutinize the medication. I don't agree. I think that nurses . . . That's a little scary to me, frankly. It is, absolutely, absolutely, Your Honor, because . . . Am I mischaracterizing what they're saying? No, no, you're not. That's an issue that we see come up in these cases and again, not a lot of them end up for you, but these that are tried at the ALJ level, it comes up from time to time and our position is nurses or nursing homes as entities, because we're not even talking about the individual nurses or nursing staff. We are talking about essentially a corporate entity that receives state and federal Medicare and Medicaid funds, thus they're subject to reviews and inspections and I agree they should be, absolutely they should be, however, when you hold the nursing home to the level of second guessing and overriding the decisions of a treating physician licensed by the state of Texas, you are coming dangerously close to violating the Texas Medical Practice Act, which is contained in Chapter 160 of the Texas Occupations Code, as well as the Nurse Practice Act, which says nurses under their license, they can't diagnose, they can't prescribe and they can't institute treatment absent a physician's order and that's in Chapter 303. I have another what is your best case type question. You argue that the appeals board applied an incorrect standard of review when reviewing the decision of the ALJ. What is your best case for that argument? I think if you look at the case of Alwin v. Ashcroft decided by this court, it explains situations in which there are certainly at least parts of agency rulings that can be subject to a de novo review as opposed to the deferential standard or substantial evidence standard or even the abuse of discretion standard. You seem to make a constitutional argument that to hold the agency to one burden in the administrative hearing and a lesser burden on appeal somehow violates the constitution. It's maybe not a lesser burden but an incorrect burden because what we have is a statute, the Social Security Act, that entitles facilities who participate in Medicare and Medicaid to a full and fair hearing. We don't believe they got that here. The reason that we did not or we think part of the reason we think they didn't receive that here is because both the ALJ and the departmental appeals board were applying incorrect legal conclusions to facts and I think that does cross over into a constitutional violation and it's not a part of my argument that I've reached yet but in our brief you see we also complain that there was a denial of a full right to cross examine the surveyor, the only witness who testified for CMS other than the CMS enforcement expert and we're in a system where we're not allowed discovery, we're not allowed to take depositions, we're required to file what's called written pre-filed testimony which is just basically affidavits that unfortunately I think the lawyers a lot of the time end up drafting. We're not allowed to cross examine outside the scope of the affidavit and in this particular case the ALJ actually allowed the witness to lodge her own objection when I was attempting to question her as to why she left a nursing home and he says I don't believe that's relevant and while he didn't think it was relevant I certainly think what the U.S. Supreme Court and Daubert and in Kumho-Tyre v. Carmichael have said is when a witness is designated as an expert testifying on a specialized matter impeachment through attacking credentials and qualifications it's always relevant and that didn't happen here. Is this procedure typical with no witness testimony? Unfortunately Your Honor it is and as I said not a lot of these cases get to this level but we think certainly on behalf of this client it is important because the last two cases that I argued that were cases of this type, Judge Willett was on one of the panels, Judge Dennis was on the other one, I'm sorry I can't remember which was which but I remember you Judge Willett and I remember you Judge Dennis from those panels, that's one of the things we were pointing out that we start off with two and a half out of three strikes against us because of the procedural rules but in this case it's not just two and a half out of three strikes, we weren't even allowed to step to the plate to make the arguments we needed to make to protect our client and the end result was it ended up harming the resident whose job it is of my opposing counsel CMS the government to protect and I see I'm out of time Your Honor. Thank you. Yes, Your Honor. All right, Mr. Gandhi. Good morning Your Honors, Neil Gandhi on behalf of the respondent, the United States Department of Health and Human Services. Petitioner's solutions to problems inherent in caring for resident five was to seclude him involuntarily, locking him in his room for extended periods of time. During those periods, staff often deprived him of stimuli such as toys or a television to watch. How do you know it was involuntary? Judge Jones, the reason why it was involuntary was the mother stated to the surveyors during the survey that she felt like the facility was locking up her child and drugging him. Why didn't you bring forth a statement from the mother? We did not. We have the surveyors, they're under our control through the state survey agency. So the surveyor testified through her written declaration as to what the mother told her. Well, the mother had told the nursing home that it was okay to put child-proof devices on the doorknobs, right? And Petitioner discusses in their brief that there was some sort of court order. There's no evidence of that in the record of an actual court order ordering the facility to place locks on the doors of that residence room. And in addition... Those are not locks. As I understand it, there were little lift locks for the bathroom and then a child-proof deal on the door handle to go out. Yes, Your Honor. But there were certainly locks to the extent that the resident was unable to operate them. Did they close both the top and the bottom of the Dutch door at the time? When you say he was involuntarily secluded, did that mean that they put him in there and they closed the top Dutch door as well as the bottom one? So, surveyor observations show that the top portion of the Dutch door was occasionally open, but in the record at 545, there's a layout of the facility, and what he faces is essentially the wall. That's all he can see, and as Petitioner's counsel mentioned, the resident is unable to walk, so there's no way for him to come out of the room if he wanted to. Did he usually move around in a wheelchair or with his crawling mechanism? He typically moved around in a wheelchair, but occasionally would crawl. I'm not familiar with how the resident was day-to-day. We do have the testimony from the surveyor stating that he was observed in his wheelchair, and he has the ability to crawl. I think Ms. Brewer mentioned that resident five had been a resident of Copper's Cove since he was seven. Could you repeat that question, Judge? I think Ms. Brewer mentioned that resident five had been a resident of this facility in Copper's Cove from the age of seven. Yes, Your Honor, that's correct. Was Copper's Cove ever cited for deficiencies regarding his care by state surveyors prior to this? Not that we're aware of, but the deficiencies, the noncompliance, that issue occurred right before the survey. For example, with the involuntary seclusion, the observations were made contemporaneously to the survey. The staff, three CNAs, reported to surveyors that they would place the resident in his room after meals when they're behind on showers and when they're needing to assist other residents. They were in the act of essentially any time they were running behind on work, just placing him in his room and locking him in. But the record doesn't show any previous citations for deficiencies in the treatment or care of resident five before what brought us all together today. Yes, Your Honor, but it is the nursing home's duty to be in compliance with the regulations at all times. So we don't necessarily know what happened. Petitioner brought up the issue regarding not being able to subpoena state surveyors from past surveys. The subpoenas were denied because they didn't meet regulatory requirements under 42 CFR 498.58, which state that in order for a witness to be subpoenaed, the petitioner would have to state pertinent facts and how those facts would not be available through documentation or other testimony. So that's the reason why the subpoenas were denied, because they didn't meet the regulatory requirements. Essentially, petitioner wasn't in substantial compliance with the regulations regarding involuntary seclusion, which as I mentioned earlier, we have testimony from the surveyor stating that the staff were telling her that any time they were running behind, they just had the practice of placing him in his room. Isn't there any, as Judge Willett may be implying, doesn't historical context mean anything here? If the fellow's been there for 28 years, all of a sudden it is declared that he is being overmedicated and abused in such a way that he can no longer stay there, and arguably his family life has been ruined as a result of this. But I mean, shouldn't the surveyors take into account, as we all know, most people only survive in nursing homes for less than three years in most cases. So where family is involved, as evidently the mother was here, you have a course of action, nearly three decades, where there weren't problems. And the surveys are conducted through various reasons. It could be a yearly inspection. It could be a complaint investigation. We don't know why this was never cited in the past. So his mom was just letting them mistreat him year after year after year? Certainly not. And that's why the mom told the surveyor that she felt like her child was being drugged and locked in his room. And then regarding the chemical restraint issue, there is an issue about whether or not he had the appropriate diagnosis for being prescribed Risperdal. But beyond that, and if we're to take that issue aside, the actual increase, which was a 400% increase from what he was prescribed, occurred a few months before the survey. So this isn't an issue that was occurring for 20 years. The increase happened in June of 2016. I do understand that, and I don't know about the interaction between Ativan and Risperdal. But what Ms. Brewer says is that the doctor was increasing the Risperdal, and of course doctors are free to use off-label uses of drugs, aren't they? So he was supposedly increasing that in order to decrease Ativan, which she says had more of a side effect. Now, did the surveyor address that possibility? Well, certainly the decisions, the ALJ and the board reviewed that argument. And what they found was that there was no evidence to show that that's actually what was occurring. Petitioner's counsel cited to the record at 1226, which is a handwritten note from the But what you can make out is the reason why the doctor was increasing the dosage, and it said restlessness. Well, did the dosage of Ativan decrease? There's no evidence that it decreased. You're sure of that? Yes. So the resident actually continued taking Ativan even after the survey. Yeah, but he could have been taking it at a lower level. I'm not aware of any evidence showing that the Ativan was actually decreased. And then the document that petitioner cites to showing that he was seen doesn't actually show that. What should the petitioner have done to have proved that point in your view? Which point, Judge Jones? You know, what bothers me about this, aside from the injustice of the result, which I can't, may not be able to do anything about, but it's patently unjust, is that you have this, some nurse coming in and telling the, and penalizing the nursing home because it did not second-guess the treating physician. And I do not think a nurse is entitled to second-guess a treating physician, and the nursing home is not entitled and cannot be obliged, in my view, ethically or legally, to supplant the treating physician. The regulations require the nursing home to be in compliance with federal regulations at all times. The federal, don't you say in your brief, the federal regulations say that the nursing home had an independent duty to scrutinize the medication? Certainly to ask questions. Essentially, the prescription, there's no correlation. There is some sort of aggressive behavior that occurred the morning of June 17, 2016, but there's no link to the dosage increase that occurred later that day. In fact, earlier that day, they had provided him with Ativan, and that's at the record, at 1230, they provided him with Ativan, and it produced good results. So he was exhibiting aggressive behavior. The facility provided him with Ativan, and there were good results. He was calm. And then later on that day, the dosage was suddenly increased. Well, the nursing home has policies regarding the use of anti-psychotic drugs, such as Risperdal, and that policy has specific diagnoses for which the drugs can be used. For example, schizophrenia, bipolar disorder, irritability associated with autism. I readily understand that if you've got the ordinary nursing home patient who may be suffering from dementia, because I looked up Copper's Cove on the website, and the advertising is mostly directed to older people. So you have a patient who's suffering from dementia. You shouldn't give that person Risperdal. This is obviously not the average nursing home patient. Yes, Your Honor, and there's certainly... So you're sort of shoehorning a policy into critiquing medical judgment with regard to this very unusual patient. And certainly the ALJ acknowledged that this was a resident that presented difficulties for staff to provide care for, but the staff is trained on the policy. This is policy that the nurses should have been trained on, and at that point, knowing that the policy states that these are the specific conditions, and then seeing an increase without any sort of explanation, any sort of care planning, any discussion with the physician on that dosage increase, there should have been some sort of questioning that occurred. Not scrutiny, certainly a question, documented question, to the physician saying, doctor, this is an unusual increase. It's going from .5 to 2 milligrams. The FDA sheet, for example, states that dosage increases should occur more than .5 milligrams at a time. The director of nursing herself, when asked the question by the surveyor, Surveyor Schwartz, at the record at 2411, states that she expected her staff to question that order, and at least document it, saying that... Where is her statement in the record? The statement was made to the surveyor, Your Honor. So all we have is a whole bunch of hearsay from the surveyor. Are the surveyor's notes in the record? Yes, Your Honor. The notes are in the record. The observations are in the record. The notes were made contemporaneously to the observations. The ALJ and the board aren't required to follow the federal rules of evidence, so they could consider the declaration of the surveyor who was there at the facility and questioned and made the observations. I understand that. So could the petitioner have submitted a declaration from the treating physician? Yes, Your Honor, they could have. But there is no declaration from the treating physician. The treating physician himself, when questioned about the dosage increase, he stated that he shouldn't have increased it that much and that he's a small guy. And so that's in the record at 2411, which is the surveyor declaration again. But at the time, by October of 2016, or what I read in their brief is that the dose they... After getting a complaint from the surveyor, the doctor reduced the risk at all, but then had to increase it again. Is that correct? The increase is correct. It wasn't the doctor that did it. It was a nurse that increased it. I forget the actual title of the nurse, but it wasn't the same doctor. Well, if it's so dangerous, do you think that the nurse would have done it on her own? No, Your Honor. But that increase was from .5 to 1 milligram, and then the nurse didn't increase it any further beyond that, even when approached with it. Don't you know that when you're administering anti-psychotic drugs quite often, those have to be adjusted before the patient reaches the proper level? And certainly they do have to be adjusted. The FDA sheet that's in the record talks about the dosage increases for the specific diagnosis, none of which the resident had, and they recommend changes at .5 and for anything that's above 1.5 milligrams to not occur for at least a week at a time. And just going back to the fact that the dosage was increased, there was no change in condition for that resident. In the months prior to the dosage increase, there's actually even a note from May where the facility wrote in the progress notes that the resident continues to be the same. The aggressive behaviors that he's had, he's exhibited throughout his stay at Copper's Cove, and that there were no changes in his condition to merit the dosage increase. The resident's mother stated to the surveyor that he used to smile when she visited him, but that was no longer occurring because of the medication increase. That's in the record at 1276. What else did that... Where do we... So around 1276, do we have a full account of what the mother's impression was? Not a full account. It was the notes that the surveyor was taking from her conversation. The mother could have said, but I'm very relieved if he's not getting out of his room and putting his finger in an electric socket because he doesn't know any better. And I realize that this flat affect is a consequence of the risperdal, but I guess in a tragic situation like this, it's one possibility or the other. But we don't know whether she told the surveyor that. We don't know that, but it's the facility's job to be in compliance with the Medicare regulations. So even if the mother had stated something like that, they still have a responsibility to not chemically restrain the resident, and that's what the facility was essentially doing. Going back... How many cases have you seen with people with this kind of severe behavioral and developmental problems? Is that something that is routine in nursing home survey reviews and surveys? It's certainly not routine. There are certainly residents that have conditions like dementia, but it's certainly not routine to see younger nursing home residents, which, you know, as ALJ stated in his decision, whether the nursing home was the right place for this resident is a question. However, they're still required to provide care to all residents, including resident 5, and not just to provide care to other residents from resident 5. I see that I'm running out of time. Yeah, I mean, so didn't the nursing home risk being cited later on if this fellow had gone around, you know, had actually tumped over one of their wheelchairs and injured someone? I'm out of time. Can I answer that question? I meant to theorize a hypothetical. Appreciate your answer. Yes, Your Honor. Certainly it would depend on the facts surrounding that incident. I can't give you a definite answer as to whether or not, you know, that hypothetical would result in some sort of noncompliance, but it would certainly be looked at if a surveyor were to conduct a survey around that time or if there was a complaint from somebody asking the surveyors to investigate. Thank you, Your Honors. All right. Thank you. Your Honor, absolutely that facility would have been cited if this young man, heaven forbid, had ambulated down the hall into an 85-year-old woman with a walker and caused her to fall over, hit her head, develop a subdural hematoma, and pass away. And that regulation at the time in October of 2016 could be found at 42 CFR 483.25, old tag F-323, failure to provide appropriate assistive devices, which can include medications, to prevent accidents. That's not where the regulation is located any longer because they've changed. That's where it was located at the time. Absolutely we would have been cited for it. Involuntary seclusion, as defined under the state operations manual, eliminates the involuntary component if the seclusion or if the location of the resident is at the request of a legal representative. In this case, Coppers Cove had that because the mother had requested the configuration of the room and for the room essentially, Your Honor, to be a therapeutic safe haven. He was not in that room 24-7. It was only for a temporary basis when he was overstimulated and potentially a danger to himself or a danger to others. Nobody was disciplining him. Nobody was punishing him. This was what was best to try to protect him. Did he eat in a cafeteria with the other people? I think he did, but he would not have eaten independently because of the way his arms were. He would have been seated at what they call a feeder table, which is a semicircle with slots, if you will. You can push a wheelchair up and there is usually one nurse aide or one dietary aide for every three or four residents, so there was one-on-one supervision constantly during mealtimes without the ability, because of the way the table is configured for him to reach out or make inappropriate contact with any of the other residents. If necessary, he could eat meals in his rooms, but typically it was dietary assistance. So you say that the seclusion was only temporary. Where is that supported in the record? I think if you look at the progress notes, the nurses' notes, and I apologize, I can't tell you, there's about 30 pages of them, Your Honor, and I can't give you the specific site. They're computerized-type progress notes, but they contain notes from the nurses, from the social workers from various disciplines, and it talks about the fact that he is only in his room at certain times. It is also in the testimony of Heather Beaver, the administrator, as well as Yvonne Fortson, who was the director of clinical services for Copper's Cove. She was at the corporate level. She was the supervisor of the director of nursing. It's in her written direct testimony as well. In answer, Judge Jones, to your question about the Dutch door, it was not kept closed, top and bottom. In fact, the reason this room was located where it was is so he was in, he, resident five, was in immediate proximity, the nurses station, of the medical records office, of the social worker, and of the activities department, because we recognized this is different. The problem that we had, Your Honor, when you asked Judge Jones, does history matter? It's our position. Absolutely it does, and that's why we asked to subpoena the program managers and for both the health and the life safety inspectors from Austin. Our request is on pages 170 and 171 of the record. The reason our subpoena request was denied, we submit as form over substance, because if you look at why I asked to have those subpoenaed, it says we want to show what agreements were made. We put in the prior life safety code inspection showing no citations. We wanted the program managers there to explain what they had approved. On the record, pages 546. I have one other quick question since you're out of time. Yes, Your Honor. What do you say about his comment that the surveyors said, the mothers said he looked drugged? It's what you said earlier, Judge Jones. It's a bunch of competing hearsay because the testimony from the nursing facility staff who spoke with the mothers said that the mom told them that's not what she said, and that's one of the reasons she was upset with the surveyors and went to consult her own lawyer. We could not bring her. We could not bring the treating physician as witnesses because if you get a written declaration from them, this is pre-COVID, and before these hearings were done by Microsoft Teams, I started to say Zoom, but these are done now by Microsoft Teams. It was before that was done. They were held in Dallas. You had to require somebody to physically be present in Dallas. Okay. Thank you very much. Thank you.